Entered on Docket August 29, 2014

**Below is a Memorandum Decision of the Court.**



_____
**Karen A. Overstreet
U.S. Bankruptcy Court Judge**
(Dated as of Entered on Docket date above)

_____

Karen A. Overstreet
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6310
Seattle, WA 98101
206-370-5330

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re<br><br>Richard Alan Giebel,<br><br>Debtor. | Case No. 13-18835 |
| Richard Alan Giebel,<br><br>Plaintiff,<br>v.<br><br>Rosie Styron<br><br>Defendant, | Adv. No. 13-01610-KAO<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

This matter came before the Court for trial on July 22, 2014. Plaintiff Richard Alan Giebel (the "Plaintiff") appeared through counsel, Ken Schneider, and Defendant Rosie Styron

Findings of Fact and Conclusions of Law - 1

Case 13-01610-KAO    Doc 22    Filed 08/29/14    Ent. 08/29/14 12:24:06    Pg. 1 of 13

(the "Defendant") appeared through her counsel, Daniel Hembree.  The Plaintiff filed this action to strip the lien held by the Defendant against his personal residence and to disallow her secured claim.  The Defendant's answer asserts counterclaims to except her claim against the Plaintiff from discharge under Bankruptcy Code §§ 523(a)(2)(A) and 523(a)(6).[1]  The Court has considered all of the evidence and testimony at trial and its records and files, and makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7054.  For the reasons set forth below, the Court finds that the Plaintiff's obligation to the Defendant is not dischargeable under Section 523(a)(2).  The Court further finds that the Plaintiff may not strip the Defendant's lien from his residence.

## FINDINGS OF FACT

1.  In 1998, Maurice Giebel and Defendant, husband and wife, sold their property located at 25628 121st Avenue, NE, Arlington, WA 98223 (the "Property") to the Plaintiff and his wife, Mary Giebel.  The Property was unencumbered at the time.  Plaintiff is the son of Maurice Giebel and the step-son of the Defendant.  On December 8, 1998, the Plaintiff signed a Promissory Note in the amount of $125,000 (the "Promissory Note") in favor of Maurice Giebel and the Defendant. [Exhibit D1]. The Promissory Note was payable at $700 a month with 6% interest.  The parties agreed that Maurice and the Defendant could live on the Property in a mobile home for the remainder of their respective lives.  The Promissory Note was secured by a first position Deed of Trust on the Property naming Maurice and Rosie Giebel as the beneficiaries (the "Deed of Trust"). [Exhibit D2].

2.  In 2003, the Plaintiff obtained a $75,000 loan from Frankline Bank USB, secured by a second position deed of trust on the Property, in order to satisfy a $50,000 judgment

---

[1] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §101 et seq. and to the Federal Rules of Bankruptcy Procedure, Rules 1001 et seq.

Findings of Fact and Conclusions of Law - 2

resulting from the dissolution of marriage with Mary Giebel and to pay real estate taxes. [Exhibit D7]. In March 2004, the Plaintiff's father, Maurice Giebel, passed away leaving the then 76–year-old Defendant a widow. [Exhibit D4]. The Defendant continued to reside in the mobile home on the Property until January 2011.

    3.    The Plaintiff sought a cash-out refinance of the Property in April 2006. The loan application he signed sought $230,000 in financing against the Property, which he valued in the application at $380,000. [Exhibit D11]. Based upon that application, the Plaintiff was approved for a $230,000 loan from Ownit Mortgage Solutions, Inc. (the "Refinance Loan"). The amount of the Refinance Loan was nearly the exact amount needed to pay off all delinquent real property taxes and encumbrances on the Property, including the Defendant's Deed of Trust. [Exhibit D9]. In fact, the original payoff schedule listed the Defendant's Deed of Trust in the amount of $115,000 as being paid off. The final version of the lender's Payoff Schedule, however, which was initialed by the Plaintiff, shows the Defendant's loan crossed out, indicating that the Plaintiff was seeking to pay himself from the Refinance Loan.

    4.    On May 31, 2006, the day of the loan closing, the Plaintiff signed all of the loan documents in favor of Ownit, including a promissory note, deed of trust, and subordination agreement. [Exhibits D9, D13]. The subordination agreement, which the Plaintiff signed on May 31, 2006 (the "Subordination Agreement"), provided for the subordination of the Defendant's Deed of Trust to the new deed of trust in favor of Ownit. [Exhibit D13]. The settlement statement for the Refinance Loan shows that with the subordination of the Defendant's Deed of Trust, the Plaintiff would receive $127,025.75 from the closing. [Exhibit D10].

    5.    In order for the Refinance Loan to close, the Plaintiff needed the Defendant's signature on the Subordination Agreement. So, on June 5, 2006, the Plaintiff went to the

Findings of Fact and Conclusions of Law - 3

Defendant's home and explained to her that he needed to obtain a loan so that he could replace the roof on the Property. The Plaintiff and the Defendant had a brief conversation regarding the transaction, which was the first time they had discussed the matter. The Plaintiff told the Defendant that the agreement had to be signed by that evening. He suggested they go to the Defendant's bank so that she could discuss the agreement with someone there. The Plaintiff then drove the Defendant to her Washington Mutual branch where she signed the Subordination Agreement and it was notarized by a bank officer. According to the Defendant's testimony, she and the Plaintiff were at the bank only about 15 minutes. The bank officer had only a brief conversation with her and did not show her any other loan documents.

6. The Subordination Agreement does not refer to the loan amount. The Plaintiff did not tell the Defendant that the loan amount was $230,000, nor did the Defendant ask what the loan amount would be. The Plaintiff did not show the Defendant any of the other loan documents, did not tell her that he was receiving $127,000 from the Refinance Loan or that all liens other than hers were being paid off. The Defendant testified that she assumed a new roof would cost between $10,000 and $15,000; she had no knowledge that by signing the Subordination Agreement she was subordinating her Deed of Trust against the Property to $230,000 in senior debt.

7. The Plaintiff testified that he did not tell the Defendant what the loan was for, and that he assumed the Defendant would have overheard him discuss the loan amount with the Washington Mutual banker who notarized the Subordination Agreement. The Defendant, however, did not overhear that conversation and signed the Subordination Agreement believing that she was subordinating her Deed of Trust only to a loan which would finance a new roof on the Property.

Findings of Fact and Conclusions of Law - 4

8. The Defendant signed the Subordination Agreement in reliance on the Plaintiff's representations because she trusted him, and she did not question his intent to subordinate her lien. Although the Defendant is generally educated, she was not highly experienced in financial transactions and was 78 years old at the time. She did not inquire about the amount and details of the Plaintiff's Refinance Loan and did not have legal counsel. The Defendant's sole source of information regarding the subordination was the Plaintiff, and the Plaintiff assured her his plan was to repair the roof of the house and gave her the impression that her signature on the Subordination Agreement was urgently needed. Considering the longtime familial relationship with the Plaintiff, the Defendant had no reason to believe the Plaintiff would lie. The Defendant therefore justifiably relied on the Plaintiff's representation that the Subordination Agreement applied only to a roof replacement given their family relationship, no evidence suggesting a lack of trust between Plaintiff and Defendant in the past, and given that no other information was presented to the Defendant to suggest that the Plaintiff had any other intent with regard to the Property.

9. The Plaintiff testified that he used the $127,000 in loan proceeds he received when the Refinance Loan closed to make improvements to the Property, including a new roof, which he testified at his deposition cost between $15,000 and $17,000. Transcript, July 18, 2014, testimony of Richard Giebel, p. 38. He described the improvements as a "90% remodel" of the Property. He testified that at the time his business was booming and he did not foresee any problem continuing to meet the payment terms of the Promissory Note. He also testified that he believed the Defendant's subordinated Deed of Trust was well covered by the value of the Property, which he said had been appraised by Ownit at $450,000. There was no evidence presented, however, as to that appraisal or the assessed value of the Property in 2006.

Findings of Fact and Conclusions of Law - 5

10. Based upon the evidence, the Court finds that the Plaintiff misrepresented to the Defendant that her Promissory Note would be subordinated only to a relatively small loan to pay for a new roof, that this representation was material, made with the intent to deceive the Defendant and to persuade her to sign the Subordination Agreement. The Court concludes that the Plaintiff's failure to advise the Defendant (i) that the amount of the Refinance Loan was in fact $230,000; (ii) that he intended to use the loan proceeds for a full remodel of the Property; and (iii) that her lien was the only lien not being paid off from the loan proceeds were material omissions made with the intent to deceive the Defendant and upon which she justifiably relied to her detriment, to the extent that she is unable to recover the balance of the Promissory Note from the value of the Property. Based upon the Plaintiff's testimony that he believed there would still be sufficient equity in the Property to cover the Defendant's Deed of Trust notwithstanding the subordination, the Court finds that the Plaintiff, by these misrepresentations and omissions, did not intend to injure the Defendant.

11. Less than one year after obtaining the Refinance Loan, the Plaintiff ceased making the monthly payments to the Defendant under the Promissory Note. Ultimately, on October 3, 2013, the Plaintiff filed a chapter 13 bankruptcy petition. The Defendant timely filed a proof of claim in the amount of $133,486.16, attached to which are the Promissory Note and Deed of Trust. [Case No. 13-18835, Claim 1-1]. The Plaintiff has not contested the amount of the Defendant's proof of claim. The Ownit Deed of Trust has been assigned to U.S. Bank National Association, as trustee for the holders of the Home Equity Asset Trust 2006-7 Home Equity Pass Through Certificates, Series 2006-7, which filed a claim for $289,482.62 (the "Senior Lien"). [Exhibit D23]. The parties in this adversary proceeding do not dispute the amount of the Senior Lien. Contending that the Property is worth less than the amount of the

Findings of Fact and Conclusions of Law - 6

Senior Lien, the Plaintiff seeks to strip off the Defendant's Deed of Trust from the Property pursuant to Sections 506(a) and 1322(b)(2).

12. The Plaintiff did not present any expert testimony as to the value of the Property. His counsel advised the Court that the Plaintiff's appraiser was not able to appear at the trial and asked that the Court permit him to appear at a later date. The Court denied that request and held that the Plaintiff's appraisal was inadmissible hearsay in the absence of the appraiser. As the owner of the Property, however, the Plaintiff provided testimony concerning his opinion of the value of the Property. He valued the Property in his schedules at $278,000. [Exhibit D19, p. 3 of 30]. He relied on assessed values for the Property which are set forth for the years 2009-2014 in Exhibit P7. For 2014, the assessed value is shown as $278,000.

13. The Defendant presented expert testimony from appraiser Roy Brown, who conducted two separate appraisals of the Property. Mr. Brown's first appraisal was as of December 19, 2013, and is Exhibit D21. In that appraisal, Mr. Brown valued the Property at $345,000, however, he testified that he had not been permitted to view the inside of the Property when he conducted this appraisal. Instead, he relied on the Defendant's description of the amenities of the interior of the house. Mr. Brown reduced his opinion of value to $340,000 in an updated appraisal after he was able to view the inside of the Property. [Exhibit D22]. According to Mr. Brown's appraisal, the Property consists of five acres. Mr. Brown's first appraisal assumed 2,333 square feet of gross living area. After viewing the interior of the Property, Mr. Brown reduced that to 2,095 square feet in his updated appraisal. Another difference in the two appraisals is that in the first Mr. Brown assumed there was no garage or carport. In the updated appraisal, Mr. Brown added a three-car garage, a carport and shed. He also added one more comparable property to the comparison. Mr. Brown inspected additional attached garage space,

Findings of Fact and Conclusions of Law - 7

which had been converted to a bedroom. He testified that the conversion had not received county approval, but based upon the quality of the workmanship, that the walls and ceiling had been insulated and the floor raised to the same level as the dwelling, that a permit could likely easily be obtained, the market would regard the space as living area. Mr. Brown testified concerning the detached three-car garage and submitted pictures of that garage. The Plaintiff insisted that this garage should be considered a shed for valuation purposes because it was not attached to the house. The Court concludes that the three-car garage is in fact a garage and was properly treated as such in Mr. Brown's appraisal. On cross examination, Mr. Brown was asked about Snohomish County records which show the Property as having 1773 finished square feet and only 2 bedrooms. Mr. Brown explained that the discrepancy was likely attributable to the additional square feet he added for the converted garage/bedroom.

14. The Plaintiff testified concerning some defects in the Property, including a nonfunctioning furnace, plumbing problems and damage, mold, and nearby wetlands, which he felt should reduce the value of the Property. Mr. Brown's updated appraisal, however, took these defects into account. The Court finds that Mr. Brown's updated appraisal, Exhibit D22, is a fair appraisal of the Property in the relevant time period and the Court therefore concludes that the value of the Property for purposes of this proceeding is $340,000.

## **CONCLUSIONS OF LAW**

Based upon the foregoing findings of fact, the Court makes the following conclusions of law:

### I. JURISDICTION

15. The Court has jurisdiction of this matter under 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is appropriate in this Court.

### II. NONDISCHARGEABILITY UNDER SECTIONS 523(a)(2)(A) AND 523(a)(6)

Findings of Fact and Conclusions of Law - 8

16.     The Defendant bears the burden of proof under Sections 523(a)(2)(A) and 523(a)(6) and must demonstrate each of the elements of those sections by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991). Exceptions to discharge are to be strictly construed in favor of the debtor and against the creditor.  Discharge, however, is reserved for the honest, but unfortunate debtor. *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010); *Cohen v. de la Cruz (In re Cohen)*, 523 U.S. 213, 223 (1998).

  **A.**  **Section 523(a)(2)(A)**

17.     Under Section 523(a)(2)(A), the Defendant must show by a preponderance of the evidence (1) a representation of fact by the Plaintiff; (2) that was material; (3) that the Plaintiff knew at the time to be false; (4) that the Plaintiff made with the intention of deceiving the Defendant; (5) upon which the Defendant relied; (6) that the Defendant's reliance was justifiable; and (7) that damage proximately resulted from the misrepresentation. *In re Siriani*, 967 F.2d 302 (9th Cir. 1992); *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989).  A debtor's omissions or a failure to disclose can constitute a misrepresentation where the circumstances imply the necessity of a specific set of facts and disclosure for correcting what would otherwise be a false impression. *Memorial Hospital v. Sarama (In re Sarama)*, 192 B.R. 922, 928 (Bankr.N.D. Ill 1996); *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr.N.D. Ill.1992). Thus, under Section 523(a)(2)(A), "[a] debtor's silence regarding a material fact can constitute a false representation." *Id.* at 646. (*citing Health Benefit Plan v. Westfall (In re Westfall),* 379 B.R. 798, 803 (Bankr.C.D. Ill.2007)).  A false impression caused by silence can provide an actionable basis for a misrepresentation pursuant to Section 523(a)(2)(A).  *Rainier Title Company, Inc. v. Demarest (In re Demarest),* 176 B.R. 917, 920 (Bankr.W.D. Wash. 1995)(*citing In re Howarter*, 114 B.R. 682, 684–85 n. 2 (B.A.P. 9th Cir.  1990); *Haddad v. Haddad (In re Haddad)*, 21 B.R.

Findings of Fact and Conclusions of Law - 9

421, 423–24 (B.A.P. 9th Cir. 1982), *aff'd without opinion*, 703 F.2d 575 (9th Cir. 1983). The Defendant must show <u>justifiable</u> reliance, rather than actual or reasonable reliance. The United States Supreme Court held in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) that "justifiable reliance" is the appropriate standard under Section 523(a)(2)(A). This is a more subjective standard which takes into account the knowledge and relationship of the parties themselves. *In re Apte*, 96 F.3d 1319 (9th Cir. 1996). The Court must look to all of the circumstances surrounding the particular transaction and must particularly consider the subjective effect of those circumstances upon the creditor. Furthermore, even if the falsity of the intentional representation could have been discovered upon investigation, such negligence in failing to discover a misrepresentation is not a defense to fraud, unless the person who relied on the representation is aware of the falsity or the falsity is obvious. *In re Kirsh*, 973 F.2d 1454, 1459 (9th Cir. 1992).

      18.    Based upon the findings of fact set forth above, this Court finds that the Plaintiff made material misrepresentations and omissions with the purpose of deceiving the Defendant and to induce her to sign the Subordination Agreement. The Court finds that the Defendant's reliance on the Plaintiff was justified and that as a proximate cause of the Plaintiff's conduct, the Defendant has been damaged in the amount of the difference between the value of the Property securing her Deed of Trust and the balance of her Promissory Note, calculated as follows:

| | |
|---|---|
| Value of Property | $340,000 |
| Senior Lien | <u>(289,482.62)</u> |
| Net value | $50,517.38 |
| Defendant's Claim | $133,486.16 |
| Collateral security | <u>(50,517.38)</u> |
| Damage | $82,968.78 |

The Court therefore concludes that the Defendant has been damaged in the amount of $82,968.78 and that this amount is nondischargeable under Section 523(a)(2)(A).

Findings of Fact and Conclusions of Law - 10

**B.     Section 523(a)(6)**

19.     Proof of a cause of action under Section 523(a)(6) requires a two-step process. First, the Defendant must prove that the Plaintiff committed a "willful" injury. *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 831 (B.A.P. 9th Cir. 2006). To satisfy the willfulness element, a creditor must prove that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended not just to commit the act itself, but also intended the consequences of the act. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Further, the Court must apply a subjective test in determining the debtor's intent. "[Section] 523(a)(6) renders a debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain." *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002).

The second step in the Section 523(a)(6) analysis is to determine whether the debtor's conduct was "malicious." *Khaligh*, 338 B.R. at 831. In order to be found malicious, the debtor must have committed a (1) wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) which is done without just cause or excuse. *Id.* The last element, whether the act was done without just cause or excuse, presents a mixed question of law and fact. *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105-06 (9th Cir. 2005), *cert. denied* 125 S.Ct. 2964 (2005). Evidence of specific intent to injure can negate just cause or excuse. *Khaligh,* 338 B.R. at 831.

20.     The Court finds that the Defendant failed to prove that the Plaintiff's conduct constituted a "willful and malicious" act under Section 523(a)(6). The evidence presented did not establish that the Plaintiff had a specific intent to inflict an injury on the Defendant, or that he knew such injury was substantially certain to occur. The Plaintiff believed that notwithstanding the subordination of the Defendant's Deed of Trust, there was sufficient equity in the Property at

Findings of Fact and Conclusions of Law - 11

the time the Refinance Loan was obtained to pay the Defendant's Deed of Trust in full if he defaulted. This negates Defendant's contention that the Plaintiff intended to injure her.

### III.   LIEN STRIPPING UNDER SECTION 1322(b)(2)

21.   Section 1322(b)(2) prohibits any modification of the claim of a secured creditor whose claim is secured only by the debtor's principal residence. Where the claim is secured by any amount, however slight, the claim may not be modified. *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). Only if a creditor's lien is wholly unsecured may its claim may be modified. *In re Zimmer,* 313 F.3d 1220 (9th Cir. 2002). The petition is the appropriate date for both valuing the mortgage property and for determining the amount of the senior mortgage debt. *In re Gutierrez*, 503 B.R. 458 (Bankr. C.D. Cal. 2013). *See also, Benafel v. One West Bank (In re Benafel)*, 461 B.R. 581 (B.A.P. 9th Cir. 2011) (the court concluded that the use of the petition date for determining the anti-modification provision of Section 1322(b)(2) is the clear majority rule); and *TD Bank, N.A. v. Landry*, 479 B.R. 1 (Bankr. D. Mass. 2012)(the proper time for valuing residential property that secured junior mortgagee's claim, for purposes of deciding whether junior mortgagee was undersecured or held a claim that was wholly unsupported by any equity in property and not protected from "strip off" by anti-modification provision of Chapter 13 was the petition date). In this case because the fair market value of the Property ($340,000) is greater than the amount of the Senior Lien ($289,482.62), the Plaintiff may not strip the Defendant's Deed of Trust from the Property.

### CONCLUSION

The Court finds in favor of the Defendant under Section 523(a)(2) in the amount of $82,968.78 and against the Defendant as to Section 523(a)(6). The Court further finds that the Plaintiff may not strip the Defendant's Deed of Trust from the Property under Section

Findings of Fact and Conclusions of Law - 12

1322(b)(2). The Defendant may submit an order and judgment in conformance with these Findings of Fact and Conclusions of Law.

///END OF FINDINGS AND CONCLUSIONS///

Findings of Fact and Conclusions of Law - 13